638 P.2d 235

Rebecca **GODBEY, Harriet H. Philips, Barbara A. Robblee and Patricia M. Wright, on behalf of themselves and all other persons similarly situated, Plaintiffs-Appellees,**

v.

**ROOSEVELT SCHOOL DISTRICT NO. 66 OF MARICOPA COUNTY, Roosevelt Board of Trustees, Bernard Black, Donald Campbell, Robert Garcia, Frank Benites and Janine Saunders, Defendants-Appellants.**

No. 1 CA–CIV 5039.

Court of Appeals of Arizona,
Division 1,
Department A.

Oct. 20, 1981.

Rehearing Denied Nov. 27, 1981.

Review Denied Dec. 22, 1981.

**14**

Law Offices of McKendree & Lubin by John F. Sass and Stanley Lubin, Phoenix, for plaintiffs-appellees.

Thomas E. Collins, Maricopa County Atty. by Q. Dale Hatch, Deputy County Atty., Phoenix, for defendants-appellants.

## OPINION

CONTRERAS, Judge.

At issue is the validity of the actions of a School District administrator and the governing Board of Trustees (Board) in (1) establishing a requirement that absent teachers submit doctors' certificates in order to make use of paid sick leave benefits, and (2) docking the pay of teachers who were absent and did not submit such certificates. Written findings of fact and conclusions of law were entered by Judge Sandra D. O'Connor. The trial court concluded that the administrative order establishing such requirement was invalid without prior Board approval and that the Board's subsequent resolution approving such requirement could not be applied retroactively. The trial court therefore entered judgment in favor of the teachers whose pay had been docked for failure to comply with such requirement. We affirm.

### FACTUAL BACKGROUND

A collective bargaining agreement (Agreement) was entered into on July 1, 1972, covering the terms and conditions of employment of appellees and other school district teachers for the period extending from July 1, 1972, to June 30, 1975.[1] On June 18, 1974, appellant Roosevelt School District No. 66 (District) adopted a sick leave policy statement which incorporated the sick leave provisions of the Agreement. Those provisions governed the amount of sick leave earned. A further provision of the Agreement required an absent teacher to submit a "Cause of Absence" form in order to obtain paid sick leave.[2] Neither

---

1. The collective bargaining agreement was entered into by and between the Board of Trustees of Roosevelt School District No. 66 and the Roosevelt Classroom Teachers Association which was recognized as the teachers' representative for collective bargaining purposes.

2. Relevant portions of the Agreement provide:
 Article XIX

the Agreement nor the Board's sick leave policy statement made any mention of a requirement for independent verification of illness.

As part of the parties' Joint Pre-Trial Statement, it was stipulated that during the time period of June 18, 1974, until the incidents in question in May of 1975, no teacher employed by the school district had ever submitted a doctor's certificate in support of his/her request for paid sick leave, and no teacher was ever denied paid sick leave on the basis that no doctor's certificate was supplied.

During the spring of 1975, the District and the teachers were engaged in meet and confer sessions to determine the salary schedule for the 1975–1976 school year. Agreement had not been reached by the spring of 1975. The parties further stipulated that during the week (Tuesday-Monday) of May 13–19, 1975, a large number of teachers employed by the District called in sick and later submitted cause of absence forms requesting paid sick leave on the basis of personal illness. In its written findings of fact, the trial court found that many teachers were engaged in a work action in the nature of a "sick-in".

On May 13, 1975, the first day of the work action, Dr. Curtis O. Greenfield, the acting superintendent, without prior formal Board approval, issued an administrative order requiring teachers to provide a doctor's certificate stating that the teacher was ill and if no such certificate was provided the teacher's pay would be docked for the days absent. The administrative order was posted in the schools and placed in teachers' mailboxes at the respective schools during the morning of May 13.

On May 20, 1975, the District Board of Trustees met and "ratified" Dr. Greenfield's order by approving a motion requiring doctors' certificates for the period commencing May 13, 1975. The Board also approved vouchers which reflected the docked pay of teachers who were absent May 13–19.

On June 17, 1975, appellees filed suit to recover the docked pay. On February 23, 1977, the action was certified as a class action under Rule 23(b)(1) and (2), Arizona Rules of Civil Procedure, 16 A.R.S., hereafter referred to as Rule 23. On June 7, 1979, the trial court, sitting without a jury, entered written findings of fact, conclusions of law, and judgment in favor of appellees. This appeal followed. Although the parties are not in full agreement, the essential issues presented are:

1. Was this a proper class action suit under Rule 23, Arizona Rules of Civil Procedure?

TEMPORARY LEAVES
A. Personal Illness
1. All teachers must earn sick leave at the rate of one (1) day for each register month worked, accumulative indefinitely.
2. Employees on ten (10) and twelve (12) month contracts earn sick leave at the rate of one (1) day for each month worked, accumulative indefinitely.
3. Teachers who are unable to report for work on the first day of school for good cause are considered to be covered under the leave of absence clause. All rights accruing to them are retained, but can not be given to them until they return to work (leave is terminated). Therefore, in case of someone who had accumulated sick leave, he would not lose this leave, but he could not be put on the payroll for it until he actually showed up for work.
4. Should an employee fail to appear on the opening day of school for any reason other than illness, the sick-leave for the year will be reduced by an amount proportional to the amount of the school year that elapses before the employee begins work.
5. When a tenure teacher has used all of his sick leave, the substitute's pay shall be deducted from his salary for the next ten (10) days he is absent, and after that, a full day's pay shall be deducted for each day's absence.
6. When an employee is injured on the job and the injury involves salary compensation from the State Compensation Fund and the absence is also covered by sick leave, the employee shall be paid the difference between the compensation rate of pay and the daily rate of pay.
. . . .
D. General Information
1. A "Cause of Absence" form shall be completed for all temporary leaves of absence, signed by the employee and his immediate supervisor, and sent to the payroll department.

2. Can changes in sick leave policy and procedures be made by administrative order?

3. Can changes in sick leave policy and procedures enacted by the Board of Trustees be applied retroactively?

## I

## PROPRIETY OF CLASS ACTION CERTIFICATION

■ The issue of whether a suit should be allowed to proceed as a class action is left to the trial court's discretion and, absent an abuse of discretion, we will not interfere with the decision of the trial court. *Home Federal Savings and Loan Ass'n v. Pleasants*, 23 Ariz.App. 467, 534 P.2d 275 (1975); *Carpinteiro v. Tucson School District No. 1*, 18 Ariz.App. 283, 501 P.2d 459 (1972). The prerequisites to a class action are set forth in Rule 23, Arizona Rules of Civil Procedure.[3]

### *RULE 23(a)*

■ Appellant's principal contention with regard to Rule 23 is that the claims of the named plaintiffs/appellees are not typical of the claims of the class, and therefore the requirement of Rule 23(a)(3) is not sat-

isfied. Appellants suggest that there are three subclasses of teachers involved: (1) those who were in fact sick during the period in question and can produce certificates to that effect; (2) those who were sick but cannot produce certificates; and (3) those who were not sick but were nonetheless absent. Appellants further suggest that the named plaintiffs/appellees represent only subclass 2, and that the majority of the entire class is made up of members of subclass 3. Appellants argue that the claims of those teachers who were actually sick are not typical of the claims of those who were not sick and who allegedly comprise the majority of the class.

We initially note that although individual class members may seek different monetary amounts, this does not mean that the claims of the named plaintiffs/appellees are atypical. In an action to recover overtime compensation, in which there was no indication that the amounts sought were identical, the Arizona Supreme Court found that a class action was proper under Rule 23(a). *State v. Boykin*, 109 Ariz. 289, 508 P.2d 1151 (1973).

The requirements of Rule 23(a)(3) were fully considered in *Lennon v. First National Bank of Arizona*, 21 Ariz.App. 306, 518 P.2d 1230 (1974). There the court summarized:

3. Rule 23 provides in part:

Rule 23. Class actions

23(a) Prerequisites to a class action. One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

23(b) Class actions maintainable. An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:

(1) the prosecution of separate actions by or against individual members of the class would create a risk of (A) inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class, or (B) adjudications with respect to individual members of the class which would as a practical matter be dispositive of

the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests; or

(2) the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole; or

(3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

Under Rule 23(a)(3) the claims of the representative party must be "typical" of the claims of the class. Some courts have held that the typicality requirement is satisfied when common questions of law or fact exist. *Green v. Wolf Corp.*, 406 F.2d 291, 299 (2d Cir. 1968). Others have held a representative's claim typical if the interests of the representative are not antagonistic to those of absent class members. *Thomas v. Clarke*, 54 F.R.D. 245 (D.C.Minn.1971); *Katz v. Carte Blanche Corp.*, 52 F.R.D. 510 (W.D.Pa. 1971). Still others require the representative to demonstrate that absent class members have suffered the same grievances of which he complains. *White v. Gates Rubber Company*, 53 F.R.D. 412, 415 (D.C.Colo.1971).

*Id.*, 21 Ariz.App. at 309, 518 P.2d at 1233.

From the foregoing suggested tests, it is seen that the second test is the most liberal and is clearly met in this case. The first and third tests overlap with the requirement of Rule 23(a)(2) that there exist questions of law and fact common to the class, and the possible additional requirement of Rule 23(b)(3) that such common questions predominate. Such an overlap was recognized in *Lennon, supra*, 21 Ariz.App. at 310, 518 P.2d at 1234. While *Lennon* was brought as a class action under Rule 23(b)(3) and the present case under Rule 23(b)(1) and (2),[4] both parties here have briefed the question of compliance with Rule 23(b)(3). Since the parties have not consistently kept the requirements of alternative subsections separate, and since the minute entry granting certification as a class action did not specify the grounds therefor, we consider it appropriate to review the Rule 23 issues in the form in which they were presented to us.

## RULE 23(b)

Appellants contend that the critical question is whether each individual teacher was in fact sick. Accordingly, they argue that individual determinations will be required, and that therefore common questions, even if they do exist, do not "predominate," and a class action was inappropriate. We disagree for several reasons.

First, class action certification was sought, and apparently granted, on the basis of Rule 23(b)(1) and (2), not Rule 23(b)(3), and the "predominance" requirement of the latter subsection is arguably not relevant to the question of the propriety of certification, and appellants' challenge is therefore misdirected.

Second, even if the "predominance" requirement of Rule 23(b)(3) is relevant, we believe it was satisfied. Even assuming arguendo that some class members (those who presented doctors' certificates) have already received a refund and are entitled to no further monetary recovery, and that some class members (those who were not sick) may never have been entitled to any monetary recovery, we do not believe that the claims of the named plaintiffs/appellees are atypical, or that common questions of fact or law do not predominate. Notably, the monetary amounts sought are relatively small (none more than $150, and most less than $100). However, the cornerstone of this action is not the amount of monetary recovery, but the challenge to the policies of requiring doctors' certificates and docking pay, as initiated by the acting superintendent and subsequently adopted by the Board. Whether those policies were valid and lawful are questions of law common to all class members, and questions which lie at the heart of this case.

4. Appellees' complaint, designed to meet the requirements of Rule 23(b)(1) and (2), alleged, in pertinent part:

E. That the prosecution of separate actions by individual members of the class would create a risk of inconsistent or varying adjudications thereby establishing incompatible standards of conduct for the School District and Board of Trustees and would create a further risk of adjudications with respect to certain individual members of the class which would be dispositive of the interests of other members of the class and which might substantially impede or impair their ability to protect their interests; and

F. That the defendant Board of Trustees has acted or refused to act upon grounds generally applicable to the class, thereby making final relief appropriate with respect to the class as a whole.

■ Third, we believe the requirements of Rule 23(b)(3) (and Rule 23(a)(3), to the extent they overlap) should be liberally construed.

The federal courts have expressed the view that any doubts concerning maintenance of a class action should be resolved in favor of such action. *Esplin v. Hirschi,* [infra]; *Gerstle v. Continental Airlines, Inc.,* 50 F.R.D. 213 (D.C.1970).

. . . .

Maintenance of a class action does not depend upon commonality of all questions of fact and law, but only that such questions *predominate* over questions affecting individual members of the class. *Like v. Carter,* 448 F.2d 798 (8th Cir. 1971); *Goldstein v. Regal Crest, Inc.,* 59 F.R.D. 396 (D.C.1973). The common questions need not be dispositive of the entire action. *Esplin v. Hirschi,* 402 F.2d 94 (10th Cir. 1968), cert. den., 394 U.S. 928, 89 S.Ct. 1194, 22 L.Ed.2d 459.

*Home Federal Savings & Loan Ass'n v. Pleasants,* 23 Ariz.App. at 470, 534 P.2d at 278 (emphasis in original).

Finally, we believe that in the present case a class action is both manageable and desirable. If, as the trial court held, the policies in question were invalid as adopted, then there is room for little, if any, litigation as to the District's defenses against individual teachers, and little likelihood that the class action would "splinter into numerous trials of individual issues." *Lennon, supra,* 21 Ariz.App. at 311, 518 P.2d at 1235; *Pleasants, supra,* 23 Ariz.App. at 470, 534 P.2d at 278. In the context of the present case, class action is superior to other available methods of seeking relief. As in *Lennon,* the individual monetary claims are not only subordinate to the question of the legality of the policy itself, but they are relatively small and easily calculable.

The only possible alternative which we envision would be individual suits. It is highly unlikely that any significant number of absent class members would individually file lawsuits against the [District] in light of the relatively small individual recoveries.

. . . .

Therefore, the only possible device which would afford relief to numerous plaintiffs with small claims would be a Rule 23 class action.

*Lennon, supra,* 21 Ariz.App. at 311, 518 P.2d at 1235.

For the foregoing reasons, it is our opinion that the "typicality" requirement of Rule 23(a)(3) and the "predominance" requirement of Rule 23(b)(3), to the extent it was applicable, were satisfied. The trial court properly allowed this suit to proceed as a class action.

II

## AUTHORITY OF SUPERINTENDENT

■ The trial court made a conclusion of law that Acting Superintendent Greenfield's Administrative Order dated May 13, 1975, was of no force and effect without prior Board approval. The trial court also found that, if given effect, the administrative order would have constituted a substantive rather than a mere administrative or procedural change in the granting of sick leave. We agree.

We have not been directed to any Arizona statutory or case authority concerning the scope of the authority of the superintendent (or acting superintendent) to promulgate rules governing the conduct of teachers, and specifically the actions to be taken by teachers to make use of their contractual employment benefits. Appellants have cited a generalized encyclopedia statement that any reasonable rule adopted by a superintendent not inconsistent with some statute or some other rule prescribed by higher authority is binding on the school. 68 Am.Jur.2d Schools § 53, p. 404.

We believe that appellants overstate the rulemaking authority of the superintendent in the context of the present case.[5] If the superintendent has the power claimed, it must be because

5. Even the characterization of Dr. Greenfield's administrative order as a "rule" or "rulemaking" is to some extent conclusory. An order which impairs contract or other vested rights cannot be justified by calling it a "rule" made by someone with "rulemaking" power.

1. the power is inherent in the office, or
2. the power has been conferred by statute, or
3. the power has been properly delegated by the Board.

We are unable to accept any of those propositions.

■ First, while a superintendent may oversee the day-to-day administration of the district, he has no common-law powers but only those specifically granted to him by statute or lawfully delegated to him by the Board. 3A Antieau on Local Government Law, § 30Q:7.03.

Second, the claimed power is not based on statute. A.R.S. § 15–444(A)(1) (now A.R.S. § 15–503(A)(1)) authorizes the Board to employ a superintendent. But the statutes are almost completely silent on the specific powers of the superintendent. We have not been directed to any statute specifically granting rule-making power to the superintendent. Had the legislature intended that he have such power, it could have so provided. *Cf.* A.R.S. § 15–204(A) (now A.R.S. § 15–843(E)) (granting superintendent authority to suspend pupil); *Burnkrant v. Saggau,* 12 Ariz.App. 310, 470 P.2d 115 (1970).

Third, the claimed power cannot be said to have been delegated to the superintendent by the Board. A.R.S. § 15–441(A) (now A.R.S. § 15–341(1)) authorizes a school Board of Trustees to prescribe and enforce rules, but we have not been directed to any statute specifically authorizing the Board to delegate to the superintendent its rule-making power. This court has previously concluded that

[w]here, as in Arizona, the power to manage and control the affairs of the school district lies exclusively with the board of trustees, except where that power has been by specific legislation granted to someone else, the Board may not delegate that authority without specific legislative authorization.

*Board of Education of Scottsdale High School District No. 212 v. Scottsdale Education Association,* 17 Ariz.App. 504, 511, 498 P.2d ˙578, 585 (1972), *vacated on other grounds,* 109 Ariz. 342, 509 P.2d 612 (1973). *Accord, Noe v. Edmonds School District No. 15,* 83 Wash.2d 97, 515 P.2d 977 (1973).

■ We do *not* hold that the only powers the superintendent can exercise are those which the legislature has expressly granted him or expressly authorized the Board to delegate to him. We do not deny that the Board may delegate to the superintendent, without express legislative authorization, certain day-to-day administrative tasks. For example, in the present case, someone had to design the "Cause of Absence" form to be filled out by the teacher. The form was called for, but not described, in the Agreement. On the other hand, there are clearly some powers of the Board, such as the power to contract with teachers, which the Board cannot delegate to the superintendent without express legislative authorization to do so. That distinction was at least implicit in *Scottsdale,* where we spoke of the power to *manage and control* the affairs of the district. That same distinction was perhaps more clearly expressed by the Supreme Court of Colorado in *Big Sandy School District No. 100–J v. Carroll,* 164 Colo. 173, 178, 433 P.2d 325, 328 (1967):

[T]he general rule is that a municipal corporation, or a quasi-municipal corporation such as the District, may delegate to subordinate officers and boards powers and functions which are ministerial or administrative in nature, where there is a fixed and certain standard or rule which leaves little or nothing to the judgment or discretion of the subordinate. However, legislative or judicial powers, involving judgment and discretion on the part of the municipal body, which have been vested by statute in a municipal corporation may *not* be delegated unless such has been expressly authorized by the legislature. See C. Rhyne, Municipal Law, 74, and E. McQuillan, Municipal Corporations, 845–49 (3d ed. 1966).

If the action of the superintendent is characterized as "ministerial or administra-

tive", then the power was delegable without express legislative authorization. If the action is characterized as "legislative or judicial", then the power was not so delegable. We believe that the latter characterization is more accurate.

Had Dr. Greenfield's order been issued under different circumstances, we might be more inclined to view the power as delegable. Had it been issued in less turbulent times, and had it been initially acquiesced in by school administrators and teachers, it might more properly be characterized as a matter of day-to-day administration. But issued when it was, in a time of labor disagreement, working a major change in prior practice, arguably in retaliation for the work action, and in effect only for a short period of time, we believe that the statutory directives should have been followed closely—*i.e.*, the rule should have been adopted by the Board in accordance with A.R.S. § 15–441(A) (now A.R.S. § 15–341(1)) and not by the acting superintendent.

Finally, even if the power to make the rule requiring verification of illness were characterized as "ministerial" and therefore delegable without specific legislative authorization, we have not been directed to any act of the appellant Board purporting to actually delegate such power to Dr. Greenfield.

Since A.R.S. § 15–441(A) (now A.R.S. § 15–341(1)) reposes in the Board the power to prescribe rules and the administrative order sought to change previously established rules regarding teacher absences, such rule, if it were to be adopted, at a minimum should have been by the Board and not by the acting superintendent. We agree with the trial court's conclusion that the acting superintendent's administrative order was of no force and effect without prior Board approval.

### III

### VALIDITY OF THE BOARD'S RETROACTIVE APPROVAL

■ As previously stated, the legislature has delegated to the Board the power to manage and control the affairs of the district. *Kelly v. Martin*, 16 Ariz.App. 7, 490 P.2d 836 (1971); A.R.S. §§ 15–441(A) and –442 (now A.R.S. §§ 15–341 and –342). That power has been characterized as "plenary . . ., subject only to various statutory limitations." *Garrett v. Tubac-Amado School District No. 5*, 9 Ariz.App. 331, 333, 451 P.2d 909, 911 (1969). In addition, the Board must act in the public interest. *School District No. One of Pima County v. Lohr*, 17 Ariz.App. 438, 498 P.2d 512 (1972); *School District No. 69 of Maricopa County v. Altherr*, 10 Ariz.App. 333, 458 P.2d 537 (1969).

Appellants contend that the Board, consistent with its broad rule-making power, could validly adopt and implement retroactively the acting superintendent's administrative order changing sick leave policy and procedure. Appellees, on the other hand, argue *inter alia* that, notwithstanding the broad rule-making power of the Board, the Board could not make such a substantive change during the contract year and, at the very least, such a change cannot be applied retroactively to take away vested benefits. The trial court specifically concluded, as a matter of law, that the Board's resolution of May 20, 1975, which effected such change could not be applied retroactively. We agree.

■ As noted above, prior to May 13, 1975, entitlement to and payment for sick leave was governed by the collective bargaining agreement ("Agreement between the Board of Trustees and the Roosevelt Classroom Teachers Association—July 1, 1972 to June 30, 1975") and the Board's document of June 18, 1974, entitled "Sick Leave (A Statement of Policy)". The policy statement made no substantial changes in the terms of the Agreement and in fact adopted its terms. The relevant portions of the Agreement pertaining to sick leave have been set forth in footnote one. The procedure for obtaining paid sick leave is set forth in Article XIX(D) of the Agreement. Article XIX(D) requires the "Cause of Absence" form to be completed, signed by the employee and the immediate supervisor, and then sent to the payroll department. There was no contractually ex-

pressed requirement as to any further conditions or prerequisites for paid sick leave, thereby implying that there were none. Certainly, as both parties agree, it was the established practice to accept the "Cause of Absence" form signed by the teacher without independent verification of illness. The Agreement does not state explicitly that the cause of absence form, as filled out by the teacher and approved by the supervisor, was to be conclusive as proof of illness and entitlement to sick pay. Nevertheless, it is well established that the acts of the parties under the contract, before disputes arise, are the best evidence of the meaning of doubtful contractual terms. *Associated Students of University of Arizona v. Arizona Board of Regents*, 120 Ariz. 100, 584 P.2d 564 (1978), *cert. denied*, 440 U.S. 913, 99 S.Ct. 1226, 59 L.Ed.2d 462 (1979); *Brown v. Cowden Livestock Co.*, 187 F.2d 1015 (9th Cir. 1951). The parties in their pretrial statement stipulated that for the year prior to the "sick-in", no teacher employed by the school district ever submitted a doctor's certificate in support of a request for paid sick leave and "... no teacher was ever denied paid sick leave on the basis that no doctor's excuse [certificate] was supplied or any other reason." Thus, it does appear that the procedure in effect prior to May 13, 1975, did reflect the parties' interpretation of Article XIX(D). As such, it was substantial evidence that the contractual right to sick leave included the right to use it without independent medical verification.

 Public employees' benefits are not gratuities but are vested rights in the nature of deferred compensation. The right to receive such benefits vests when, in accordance with the contract of employment, the employee fulfills certain conditions precedent—*e.g.*, continued employment for a certain period of time. Once vested, those rights cannot be retroactively impaired by the public employer. *Yeazell v. Copins*, 98 Ariz. 109, 402 P.2d 541 (1965); *City of Phoenix v. Boerger*, 5 Ariz.App. 445, 427 P.2d 937 (1967). Leave benefits are conceptually no different from pension benefits, and the same prohibition on retroactive impairment applies when there is a

written agreement pertaining to employment. *Cf. Bennett ex rel. Arizona State Personnel Commission v. Beard*, 27 Ariz. App. 534, 556 P.2d 1137 (1976). A public employee has a right to rely on the statutory or contractual provisions governing benefits as they existed at the time he entered into the contract of employment. *Yeazell, supra.*

Appellees' entitlement and method of exercising sick leave benefits were established by the Agreement and vested according to the terms of the Agreement. The amount of sick leave to which an individual teacher was entitled was determined by Article XIX(A) of the Agreement. As the teacher worked through the school year, he/she acquired a vested right to an increasing number of days of sick leave. The procedure for obtaining paid sick leave was prescribed by Article XIX(D) of the Agreement. Above we have concluded that the right to make use of sick leave included the right to use it free of any requirement of independent medical verification. Thus, on the morning of May 13, 1975, each teacher had a vested right to use a certain amount of accumulated sick leave, upon his/her own certification through the use of a "Cause of Absence" form that it was taken because of personal or family illness. Above we have also concluded that the order of Superintendent Greenfield on May 13, 1975, was without legal effect. Therefore, on the morning of May 13, 1975, and each day thereafter, each teacher had a vested right to use accumulated sick leave, and receive pay for such sick leave, upon his/her own utilization of the contractually prescribed "Cause of Absence" form. The Board action of May 20, 1975, purporting to impose additional requirements on the use of sick leave on and after May 13, 1975, through May 19, 1975, was tantamount to an impairment of already vested contractual rights. *Yeazell, supra.* The trial court was correct in concluding, as a matter of law, that the changes in sick leave policy and procedures approved by the Board on May 20, 1975, could not be applied retroactively.

The judgment is affirmed.

OGG and DONOFRIO, JJ., concur.